IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

|  |  |
|---|---|
| DASHA FINCHER,<br><br>     *Plaintiff,*<br><br>v.<br><br>THE MONROE COUNTY BOARD OF<br>COMMISSIONERS, *et al.,*<br><br>     *Defendants.* | CIVIL ACTION NO.<br>5:18-cv-00424-TES |

## ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Before the Court is the remaining Defendants Monroe County Board of

Commissioners ("Monroe County"),[1] Allen Henderson, Cody Maples,[2] and Kevin

---

[1] Plaintiff has sued the Monroe County Board of Commissioners, not Monroe County itself. The Board of Commissioners is a group of elected officials charged with governing Monroe County. Typically, suit should be brought against the county itself, not the county's board of commissioners. *See Arnett v. Bd. of Comm'rs of Decatur Cty.*, 75 Ga. 782, 1885 WL 2184, *2 (1885); *Owens v. Lowndes Cty. Sheriff Dept.*, No. 7:17-CV-20-HL-TQL, 2017 WL 2662193, at *3 (M.D. Ga. 2017); *Thompson v. Carter*, 905 F. Supp. 1073, 1074 (M.D. Ga. 1995) ("Naming the board of commissioners as a defendant in this lawsuit is not the equivalent of naming the county itself"). However, as discussed in greater detail below, to the extent Plaintiff intended to name Monroe County as a defendant, Plaintiff's claims still fail. To the extent Plaintiff intended to file suit against the commissioners, Plaintiff's claims also fail because she did not allege that any actions of the individual commissioners caused her harm.

[2] On December 11, 2019, the Court received a Suggestion of Bankruptcy [Doc. 36], indicating that Defendant Cody Maples filed a Chapter 13 bankruptcy and that, pursuant to applicable bankruptcy law, an automatic stay as to any civil actions against Maples is now in effect. On December 2, 2019, Maples nonetheless joined the other Defendants in filing a motion for summary judgment. [Doc. 30]. Because of the automatic bankruptcy stay, the court will not rule on Maples' summary judgment until the Bankruptcy Court lifts the stay as to this suit.

Williams' summary judgment motion [Doc. 30]. Plaintiff Dasha Fincher spent 94 days in jail based on a field drug test's false-positive result that led sheriff deputies to mistake blue cotton candy for methamphetamine. Plaintiff subsequently filed suit against Monroe County, the two arresting sheriff deputies, Williams and Maples, and the sheriff's evidence custodian, Henderson.[3] These Defendants argue that all claims against them arising from Plaintiff's arrest and detainment for the mistaken substance are due to be dismissed. Plaintiff essentially argues that she was treated with deliberate indifference during her confinement, and the officers lacked arguable probable cause to arrest her. While the Court certainly sympathizes with Plaintiff, the Court finds that, as a matter of law, Plaintiff has failed to present evidence that shows Defendants could be liable for events arising from her arrest and detainment.

## FACTUAL BACKGROUND

### A.      Initial Stop and Search of Vehicle

On December 31, 2016, Plaintiff and her boyfriend, David Morris, decided to run an errand for a friend and take a pawn ticket from Macon to Bolingbroke, Georgia. [Doc. 32, Fincher Depo., p. 17:13—18]; [Doc. 33, Morris Depo., pp. 16:23—17:12]. Morris drove a friend's car, and the two took I-75 north to the Pate Road exit. [Doc. 32, Fincher

---

[3] Plaintiff also filed suit against Sirchie Acquisition Company, LLC ("Sirchie"), the company that designed and manufactured the field drug test in question. The Court previously granted Sirchie's motion to dismiss and motion for entry of final judgment. [Doc. 12]; [Doc. 17].

Depo., p. 18:3—22]; [Doc. 33, Morris Depo., p. 18:1—8]. The car had tinted windows. [Doc. 32, Fincher Depo., pp. 53:22—54:1].

Defendants Kevin Williams and Cody Maples positioned their patrol car in the median of I-75 just before the Pate Road exit, facing northbound traffic. [*Id.*, p. 19:10—25]; [Doc. 33, Morris Depo., p. 18:9—13]. The weather was overcast and rainy, and the officers thought that Plaintiff's car window tint appeared to be too dark. *See generally* [Doc. 34, Dash Cam Video]; [Doc. 40, Maples Depo., p. 21:11—13]; [Doc. 41, Williams Depo., p. 39:3—7].

The officers initiated a traffic stop, with video evidence showing their patrol car's lights reflected on road signs as the two vehicles entered the Heritage Farm subdivision. [Doc. 34, Dash Cam Video, 01:05—01:49]. Plaintiff's car did not stop immediately and continued driving past empty stretches of road where the car could have pulled over. [*Id.*, 01:05—01:49]. Morris then finally stopped the car on the shoulder. [*Id.*, 01:05—01:49]. Plaintiff told Morris that he was about to go to jail because he did not have a license. [Doc. 32, Fincher Depo., p. 21:11—14].

Both Williams and Maples exited their patrol car and approached Plaintiff's car on the passenger's side where Plaintiff was sitting. [Doc. 34, Dash Cam Video, 01:49—02:35]. Morris told the officers that he did not have a valid license. [Doc. 32, Fincher Depo., p. 22:12—13]. The video then shows Maples tested the window tint, which the

officers found to be just under the legal limit. [Doc. 34, Dash Cam Video, 03:09—03:30]; [Doc. 40, Maples Depo., p. 26:8—23]; [Doc. 41, Williams Depo., pp. 41:16—42:1].

Approximately four minutes into the stop, the deputies called in Morris's license number and Plaintiff's name and date of birth into dispatch. Both Plaintiff and Morris had suspended licenses, which meant neither of them could legally drive. [*Id.*, pp. 61:19—62:4]. The officers asked Plaintiff and Morris to exit the car. [Doc. 34, Dash Cam Video, 06:03—08:30]. Now outside, Plaintiff and Morris consented to Williams' request to search their vehicle. [Doc. 32, Fincher Depo., p. 23:9—16].

Williams searched the car and found a bag of what later turned out to be blue cotton candy on the floorboard of the passenger's side of the vehicle. [*Id.*, p. 24:11—18]; [Doc. 34, Dash Cam Video, 12:00—14:50]. Williams described it as a blue crystallized substance. [Doc. 41, Williams Depo., p. 41:11—22]. Plaintiff explained during her deposition that the cotton candy was likely hardened from being a day old and left in the car. [Doc. 32, Fincher Depo., p. 58:19—22]. When Williams pulled the substance out of the car, Plaintiff and Morris simultaneously identified it as cotton candy. [Doc. 33, Morris Depo., p. 22:13—17].

**B.     Testing and Identification of the Substance as Concealed Methamphetamine**

Williams knew methamphetamines could be concealed in many ways, but he had only seen meth before that was white, brown, or pink. [Doc. 41, Williams Depo., pp. 18:24—19:16]. Williams never told Maples why he thought the substance was meth.

[Doc. 40, Maples Depo., p. 20:13—17]. Maples smelled the substance and, according to Plaintiff and Morris, said it smelled like cotton candy. [*Id.*, p. 20:13—17]; [Doc. 32, Fincher Depo., p. 54:11—12]; [Doc. 33, Morris Depo., pp. 22:25—23:1]. Maples and Williams both admitted they sniffed the substance, but neither claimed to recall any particular odor. [Doc. 40, Maples Depo., p. 20:13—17]; [Doc. 41, Williams Depo., p. 35:14—20]. The GBI crime lab technician noted that the substance smelled like blueberry. [Doc. 41-1, p. 38].

Still, Williams decided to test the material for methamphetamines using the Sirchie Nark II field test kit. [Doc. 41, Williams Depo., pp. 50:23—51:4]; [Doc. 41-1, p. 4]. After Williams administered the test, he believed the result showed a purple color, which meant the tested substance contained methamphetamine [Doc. 41, Williams Depo., p. 23:2—13]. However, Williams did not technically follow the kit's instructions or his training while administering the test because he did not wear nitrile gloves or use the required dose amount of testing material. [*Id.*, pp. 22:14—17, 25:7—21, 30:9—22]. Further, Plaintiff argues the test returned a red color—which very closely matched the negative example on the Sirchie training material—indicating the substance tested did not contain methamphetamine. [Doc. 37-3]; [Doc. 37-5, p. 75].

Plaintiff appeared genuinely shocked that the test returned a positive for meth. [Doc. 34, Dash Cam Video, 27:30—29:00]. Plaintiff requested Williams test the substance again. [Doc. 32, Fincher Depo., p. 25:6—12]. Instead, Williams sent a photograph of the

test result to Gregory Phillips, a Monroe County drug investigator. [Doc. 41, Williams Depo., p. 52:3—12]; [Doc. 37-3]. Phillips agreed with Williams that the test showed a positive result for meth. [Doc. 30-4, Phillips Aff., ¶¶ 4—6].

Regarding the Sirchie test kits in question, Sheriff Brad Freeman and the officer Defendants stated that they were not aware of any complaints about the kits returning a high number of false positives. [Doc. 30-3, Freeman Aff., ¶ 4]; [Doc. 40, Maples Depo., p. 17:10—15]; [Doc. 41, Williams Depo., p. 61:5—10]; [Doc. 39, Henderson Depo., pp. 42:14—43:8]. The sheriff's office ordered the kits, and the County paid for them with money that had been allocated to the sheriff's budget. [Doc. 30-3, Freeman Aff., ¶ 9]; [Doc. 39, Henderson Depo., p. 21:5—22].

Williams did not recall reading any training material from Sirchie, except for the instructions on the box on how to use the test kit. [Doc. 41, Williams Depo., p. 34:12—18]. Henderson also did not have training on the roadside test kit. [Doc. 39, Henderson Depo., p. 20:6—12]. However, the sheriff's office appeared to have been given training material and a protocol checklist from Sirchie prior to Plaintiff's arrest. [Doc. 37-5]; [Doc. 40-1, p. 17]. Williams had used the field test kit approximately a dozen times before the incident and never had a false positive before. [Doc. 41, Williams Depo., pp. 66:16—67:2]. Williams only received training in administering the test kit from working alongside the Monroe narcotics team and reading the test kit instructions on the side of the box. [Doc. 41, Williams Depo., pp. 19:17—20:9].

## C.     Subsequent Arrest for Possessing Methamphetamine

After concluding the test result was positive, Williams handcuffed Plaintiff and Morris. [Doc. 34, Dash Cam Video, 29:00—29:30]. Plaintiff and Morris were placed in the back of the patrol car, and Williams called dispatch for a criminal history report on Plaintiff and Morris. The criminal histories showed that Morris had a prior conviction for trafficking in meth, and Plaintiff had a prior conviction for manufacturing/distributing marijuana. [Doc. 30-11]; [Doc. 30-12].

Maples and Williams submitted the evidence to Henderson, who placed the substance in the evidence locker. [Doc. 39, Henderson Depo., p. 8:3—12]; [Doc. 40, Maples Depo., p. 40:23—25]. Maples swore out a warrant for Plaintiff's arrest based on the positive field test. [Doc. 30-5]. Plaintiff was initially charged with a violation of the Georgia Controlled Substances Act. The charge was later changed to trafficking based on the weight of the substance after the warrant was sworn. [Doc. 40, Maples Depo., p. 50:14—23]; [Doc. 41, Williams Depo., p. 62:4—11]. A Monroe County superior court judge set Plaintiff's bond at $1 million cash. [Doc. 30-6].

Henderson submitted the evidence to the GBI crime lab on January 6, 2017. [Doc. 39, Henderson Depo., pp. 8:3—12, 64:14—16]. Maples later testified before the Grand Jury, admitting that he had no training in drug recognition and stating the substance had been sent to the GBI for testing. [Doc. 40, Maples Depo., pp. 45:20—41:21]. Maples had no idea why the Grand Jury was convened before the drug test result came back

from the GBI. [*Id.*, p. 46:19—21]. On March 15, 2017, the Monroe County Grand Jury indicted Plaintiff on charges of trafficking meth and possession of meth with intent to distribute. [Doc. 30-7]. GBI records show that, the next day, someone from the DA's Office requested the test result be expedited. [Doc. 39-1, pp. 8—9]; [Doc. 39, Henderson Depo., pp. 28:3—11, 30:9—16]. The GBI issued its initial report on March 22, 2017, but the test result was not published, i.e., posted on the GBI website, until March 29, 2017. [Doc. 39-1, p. 10]; [Doc. 39, Henderson Depo., pp. 35:2—36:14]. Henderson opened and viewed the report on Friday, March 31, 2017, and Monday, April 3, 2017. [Doc. 39-1, p. 11]. Henderson—who doesn't recall any specific actions in this case—stated it's not unusual for him to open a report, print it, and tell the District Attorney's ("DA") office that the report has been published. [Doc. 39, Henderson Depo., pp. 37:13—39:9]. The DA's Office has access to the GBI website, just as Henderson does. [*Id.*, p. 31:12—14]. However, there is no evidence that the DA's office accessed the report before Plaintiff was released. [Doc. 39-1, p. 11]. Henderson does not recall—and reiterated that he would not (in the performance of his duties)—communicate with Plaintiff's criminal defense lawyer. [Doc. 39, Henderson Depo., pp. 44:4—10, 65:9—22]. The report was not turned over to Fincher's public defender until the morning of April 4, 2017, and Plaintiff was released later that day. [Doc. 32, Fincher Depo., p. 57:10—15]. On April 18, 2017, the charges against Plaintiff were *nolle prossed*. [Doc. 30-9].

In total, Plaintiff spent over three months in jail as a result of the unfortunate events on December 31, 2016.

### D.    Medical Treatment While Incarcerated

Plaintiff required medical services during her incarceration at the Monroe County Jail. The Monroe County sheriff's office contracted with CorrectHealth Monroe, LLC ("CorrectHealth") to provide medical services to inmates at the jail. [Doc. 30-3, Freeman Aff., ¶¶ 10—11]. Under the terms of the contract, all medical personnel except for one LPN were employed by CorrectHealth. [*Id.*]. Williams, Maples, and Henderson each testified they were not working in the jail during Plaintiff's incarceration and played no role in providing her medical care. [Doc. 39, Henderson Depo., p. 62:7—15]; [Doc. 40, Maples Depo., p. 9:2—4]; [Doc. 41, Williams Depo., pp. 57:1—13, 58:11—14, 60:13—15].[4]

While incarcerated, Plaintiff experienced pain associated with her period. [Doc. 32, Fincher Depo., p. 45:5—16]. Plaintiff was taken to the Monroe County Hospital the same day, where she was diagnosed with an ovarian cyst. [*Id.*, p. 46:4—6]; [Doc. 30-10, p. 6]. Plaintiff's discharge instructions were to follow up "with GYN as needed." [*Id.*, p.

---

[4] However, Plaintiff contends that Defendant Kevin Williams was working in the jail and assisted with her medical treatment. Plaintiff alleges she saw Williams in jail and that a Kevin Williams is listed on her medical records. [Doc. 32, Fincher Depo., pp. 30:22—31:4]; [Doc. 37-6, pp. 29, 31, 59, 60]. However, as Defendants state, this is likely a different Kevin Williams -- a dentist as opposed to a deputy. [*Id.*]. The medical records in which the name Kevin Williams appears all concern Plaintiff's dental treatment. [*Id.*]. Further, Plaintiff did not recall being treated by—or even discussing medical care with— Defendant Kevin Williams, except for discussing her blood pressure when she was booked into jail. [Doc. 32, Fincher Depo., p. 49:1—10].

21]. Although Plaintiff asked several times about a follow-up appointment with a GYN because other inmates had scared her about what could happen with an ovarian cyst, no appointment was scheduled. [Doc. 32, Fincher Depo., pp. 49:15—50:4]. Plaintiff, however, did see the jail doctor, and she was provided pain medication as needed. [*Id.*, pp. 47:10—25, 49:15—50:4]. Since her release from jail, Plaintiff had not had a problem with her cyst because she had not had her period. [*Id.*, p. 51:2—7]. She had not consulted with any doctor about it because of financial reasons. [*Id.*].

On February 11, 2017, Plaintiff's son and daughter-in-law came to visit her with their daughter and new twins. [*Id.*, pp. 38:9—23, 41:25—42:6]. When the son entered the jail, he was arrested by an investigator on a bench warrant, so Plaintiff did not get to meet with them. [*Id.*, pp. 38:9—23]. Angry, Plaintiff punched the wall of her cell. [*Id.* p. 39:1—3]. Plaintiff was taken immediately to the medical unit and sent to the Monroe County Hospital the same day. [*Id.* pp. 39:12—40:12]; [Doc. 30-10, p. 24]. Plaintiff was diagnosed with a broken metacarpal. [*Id.* pp. 32, 42]. The doctor at the hospital told Plaintiff that they couldn't put a cast on it because it was too swollen and that she needed to come back in three days after swelling went down to get the cast. [*Id.*, p. 41:16—20]. Fincher's jail medical record the day after the hospital visit include "REFER TO ORTHO FOR HAND." [Doc. 37-6, p. 71]. However, no follow-up appointment was made for Plaintiff, and she never received a cast. [Doc. 32, Fincher Depo., pp. 42:20—43:18]. Plaintiff did receive ice and pain medication as needed, which was not every

day. [*Id.*, pp. 43:19—44:7]. Since her release from jail, Plaintiff stated she had not sought medical treatment for her hand—because she cannot afford it—but her hand still swelled and got aggravated. [*Id.*, p. 44:8—18].

E.     **Plaintiff's Lawsuit Against Remaining Defendants**

Plaintiff has sued Monroe County, Williams, Maples, and Henderson, alleging claims for false/malicious arrest, false/malicious imprisonment, malicious prosecution, negligent employment, negligent training, negligent inmate care, negligent medical care, gross negligence, and negligent/intentional infliction of emotional distress. [Doc. 4, ¶¶ 1—2].[5] It is unclear whether the individual Defendants are sued in their individual or official capacities.

## DISCUSSION

A.     **Summary Judgment Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmovant, and a fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In

---

[5] Plaintiff's response brief only contests a few of these claims against the remaining Defendants, excluding Maples. Plaintiff states that "genuine issues of material fact exist, primarily related to the results of the field drug test and lack of probable arguable cause to arrest Fincher." [Doc. 37-2, p. 10]. Further, Plaintiff addresses Henderson's possible contribution to her delayed release and the medical care she received while in jail. [*Id.*, pp. 17—18]. Plaintiff also references Williams and Maples' lack of training on the test kits. [*Id.* at pp. 2—3]. Plaintiff fails to address any state law claims.

considering this motion, "the evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at 255. However, the Court need not draw "all possible inferences" in favor of the nonmovant. *Horn v. United Parcel Servs., Inc.*, 433 F. App'x 788, 796 (11th Cir. 2011). Further, when a video recording exists of the pertinent events—as in this case—the Court "views the facts in the light depicted by the videotape." *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

The movant "bears the initial burden of informing the district court of the basis for its motion[] and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant "to rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings." *Jones*, 683 F.3d at 1292 (quoting *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2012)).

B.     **Claims Against Monroe County**

The Court first examines Plaintiff's federal and state claims against Monroe County. As to Plaintiff's federal law claims, she has failed to identify a County policy, custom, or practice that led to a violation of her rights, which would subject the County to municipal liability under *Monell v. Department of Social Services*. *See* 436 U.S. 658, 694

(1978). "Municipalities and other local governmental entities are 'persons' for purposes of § 1983, but may be held liable only where a policy or custom of the municipal entity is the moving force behind the constitutional deprivation." *Yates v. Cobb Cty. School District*, 687 F.App'x 866, 872 (11th Cir. 2017) (citing *Monell*, 436 U.S. at 690-94).

To establish that a county carried out a constitutional violation, a plaintiff "must identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech v. Clayton Cty.*, 335 F.3d 1326, 1329 (11th Cir. 2003). Further, unless an official county policy exists, the plaintiff "must show that the county has authority and responsibility over the governmental function in issue and must also identify those officials who speak with final policymaking authority for that local governmental entity." *Knight v. Miami-Dade Cty.*, 856 F.3d 795, 819 (11th Cir. 2017) (citations omitted). On the other hand, "[counties] can never be liable under § 1983 for the acts of those whom the local government has no authority to control." *Turquitt v. Jefferson Cty.*, 137 F.3d 1285, 1292 (11th Cir. 1998). Whether an official is acting as a policymaker for the State or for the county depends on the function the official is serving and "on the definition of the official's functions under relevant state law." *McMillian v. Monroe Cty.*, 520 U.S. 781, 785-86 (1997) (citation omitted).

A sheriff's office is an independent entity not subject to the control of the county in which it is located. *Bd. of Comm'rs of Spalding Cty. v. Stewart,* 284 Ga. 573, 574, 668

S.E.2d 644, 645 (2008) (citation omitted) (upholding an injunction preventing the county from interfering in the provision of medical care); *see Manders v. Lee*, 338 F.3d 1304, 1322 (11th Cir. 2003) (en banc); *Lake v. Skelton*, 840 F.3d 1334, 1339 (11th Cir. 2016), cert. denied, 138 S. Ct. 1549 (2018). County officials outside the sheriff's office do not, therefore, make policy for the sheriff's office and have no role in training or supervising deputies. *Grech*, 335 F.3d at 1336—37. Accordingly, Plaintiff's § 1983 claims against the County fail as a matter of law.

Further, Plaintiff's state law claims against Monroe County also fail as a matter of law. Monroe County has extensive immunities granted under Georgia's Constitution and laws that bar Plaintiff's recovery. *Manders*, 338 F.3d at 1312 and O.C.G.A. § 36-1-4. The Georgia Constitution, as amended in 1991, provides, "[t]he sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e) (Supp. 1993). The Supreme Court of Georgia has held that sovereign immunity extends to counties under the 1991 constitutional amendment. *Gilbert v. Richardson*, 264 Ga. 744, 452 S.E.2d 476, 479 (1994); *See also* O.C.G.A. § 36-1-4 ("[a] county is not liable to suit for any cause of action unless made so by statute"). As the Plaintiff points to no authority showing Monroe County waived its sovereign immunity, the Plaintiff's state law claims against Monroe County are barred.

**C.    § 1983 Claims**

**1.    <u>Qualified Immunity</u>**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To obtain dismissal based on qualified immunity, "a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016). If he was, the burden shifts to the plaintiff to overcome the official's qualified immunity. *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017).

To determine whether an official was engaged in a discretionary function, the Court considers whether the acts the official undertook "are of a type that fell within the employee's job responsibilities." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1263, 1265 (11th Cir. 2004). Here, the officers were clearly performing discretionary functions during the relevant incidents.

To overcome the qualified immunity defense, Plaintiff must now prove that "the defendant[s] violated her constitutional rights" and "that, at the time of the violation, those rights were 'clearly established . . . in light of the specific context of the case, not as a broad general proposition.'" *Jackson v. McCurry*, 762 F. App'x 919, 925 (11th Cir.

2019) (quoting *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017)). The Court may address these issues in any order, *Pearson*, 555 U.S. at 236, "but, to survive a qualified-immunity defense, [the plaintiff] must satisfy both showings." *McCurry*, 762 F. App'x at 925 (quoting *Wardynski*, 871 F.3d at 1208).

A plaintiff may "demonstrate that the contours of the right were clearly established in one of three ways." *McCurry*, 762 F. App'x at 925 (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012)). First, a plaintiff may establish that "a materially similar case has already been decided." *McCurry*, 762 F. App'x at 925 (quoting *Loftus,* 690 F.3d at 1204). Second, the plaintiff may "point to a broader, clearly established principle that should control the novel facts of the situation." *McCurry*, 762 F. App'x at 925 (quoting *Loftus,* 690 F.3d at 1204). Third, "the conduct involved in the case may so obviously violate the [C]onstitution that prior case law is unnecessary." *McCurry*, 762 F. App'x at 925 (quoting *Loftus,* 690 F.3d at 1205). The precedents that clearly establish law for these purposes are those of the Supreme Court, the Eleventh Circuit, and the Georgia Supreme Court. *See McCurry*, 762 F. App'x at 925-26.; *Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012); *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).

### 2. <u>Claims Against Williams in His Individual Capacity</u>

#### i. **Fourth Amendment Claims**

Plaintiff's Fourth Amendment claims against Williams arising from her alleged

false arrest, false imprisonment, and malicious prosecution are all based on her contention that Williams did not have the right to arrest her. Plaintiff disputes her stop and arrest, the search of her friend's vehicle, and the decision to test the substance for meth. [Doc. 37-2, pp. 7—8, 11, 13—14].

First, the Court examines the officers' decision to stop Plaintiff and Morris' vehicle. "The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu,* 534 U.S. 266, 273 (2002). "A traffic stop is constitutional if the officers have probable cause to believe that a traffic violation has occurred or reasonable suspicion that criminal activity is afoot." *Floyd v. City of Miami Beach,* 730 F.App'x 838, 841 (11th Cir. 2018) (citing *United States v. Harris,* 526 F.3d 1334, 1337 (11th Cir. 2008)); *see Whren v. United States*, 517 U.S. 806 (1996) (a stop is reasonable under the Fourth Amendment when police officers have probable cause to believe a person has committed a civil traffic violation).

The officers stated that the car was stopped because the windows were too tinted, which is a traffic violation. [Doc. 30-2, p. 19]. Under Georgia law:

> it is unlawful for any person to operate a motor vehicle, [w]hich has material and glazing applied or affixed to the rear windshield or the side or door windows, which material and glazing when so applied or affixed reduce light transmission through the windshield or window to less than 32 percent, plus or minus 3 percent.

*United States v. Whitlock,* 493 F. App'x 27, 30 (11th Cir. 2012) (quoting O.C.G.A. § 40-8-

73.1(b)(2)). When the officers tested the car's windows, they found the window was just below the legal limit. Further, as the weather was overcast and rainy, an officer could have reasonably believed that the car's window tint was over the legal limit. Accordingly, the Court finds that the officers had probable cause to commence an investigatory stop for the traffic violation.

Additionally, the Court finds the duration and scope of the traffic stop were also reasonable. "Following a traffic stop, the officer's investigation must be reasonably related in scope to the circumstances which justified the interference in the first place." *Whitlock*, 493 F. App'x at 31 (quoting *United States v. Ramirez*, 476 F.3d 1231, 1236 (11th Cir. 2007)). Also, "the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." *Whitlock*, 493 F. App'x at 31 (quoting *Ramirez*, 476 F.3d at 1236). "During a traffic stop, an officer may prolong the detention to investigate the driver's license and the vehicle registration and may do so by requesting a computer check." *Whitlock*, 493 F. App'x at 31 (quoting *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003)). Here, the officers' test of the window tint and investigation into Morris's license was not unreasonable in duration and scope. The investigation revealed that Morris was driving with a suspended license, and Plaintiff did not have a valid driver's license.

Next, Plaintiff challenges the legality of searching the car and testing the substance for meth. However, both Plaintiff and Morris consented to the search.

"[O]fficers can conduct a variety of checks on the driver and [the] car, including questioning the driver about the traffic violation, requesting consent to search the car, and running a computer check for outstanding warrants." *Morris v Dean*, 223 F. App'x 937, 939 (11th Cir. 2007) (quoting *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999)). Further, "one of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). As Plaintiff and Morris gave their consent, without any evidence of coercion, the subsequent search of the vehicle was permissible. Further, since the investigatory stop was reasonable in duration and scope, the Court finds no evidence in the record to suggest Plaintiff and Morris' consent was somehow otherwise tainted. *See, e.g., United States v. Valdez*, 931 F.2d 1448, 1452 (11th Cir. 1991) (finding that consent to search was tainted by unlawful traffic stop and, therefore, was not free and voluntary); *United States v. Miller*, 821 F.2d 546, 549–50 (11th Cir. 1987) (same).

Further, the Court agrees that—in the light most favorable to the Plaintiff—there was scant rationale to test the substance for meth. The substance smelled like cotton candy or blueberry, did not resemble the meth the officers had previously observed, and Plaintiff and Morris identified it as cotton candy. Still, Williams decided to test the substance because the crystallized substance was found on the floor of the vehicle after Plaintiff and Morris had failed to stop immediately. [Doc. 30-2, p. 20]. The Court is

aware of no law—and Plaintiff fails to cite to any legal theory—that states Williams was constitutionally prohibited from testing any substance found during the consensual search. To the contrary, Plaintiff and Morris waived their Fourth Amendment rights to be secure against such an allegedly unreasonable search (and, it follows, any allegedly illegal test). Accordingly, neither the search of the vehicle nor the decision to drug test the substance violated the Fourth Amendment.

Finally, the Court turns to Plaintiff's arrest. "[A] warrantless arrest lacking probable cause violates the Constitution, and such an arrest can therefore potentially underpin a § 1983 claim." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010). Subsequent detention and prosecution without probable cause could likewise give rise to claims of false imprisonment and malicious prosecution. *See Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996); *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003). "Probable cause is defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003).

For purposes of determining whether Williams is entitled to qualified immunity, the issue is whether he had arguable probable cause to arrest Plaintiff. "[A]ll that is required for qualified immunity to be applicable to an arresting officer is arguable probable cause to believe that a person is committing a particular public offense[.]" *Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001) (per curiam) (internal citation

omitted). Arguable probable cause exists "where reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendant could have believed that probable cause existed to arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who unreasonably conclude that probable cause exists." *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007).

Whether an arresting officer possessed probable cause (or arguable probable cause) "depends on the elements of the alleged crime and the operative fact pattern." *Id*. at 1137-38. Here, Plaintiff was arrested for violating the Georgia Controlled Substances Act. But that charge was later changed to possession of meth with intent to distribute and trafficking meth. [Doc. 30-5, p. 1]; O.C.G.A § 16-3-30(b).

Plaintiff argues that Williams lacked arguable probable cause because the test did not give a positive result, and Williams did not follow the proper procedures for administering the test. [Doc. 37-2, pp. 11—17]. However, Plaintiff presents no evidence that Williams knew the result was either a false positive or simply negative or that he intentionally lied about the result. Accordingly, the Court will examine whether a reasonable officer could have believed the test result was positive and whether believing the test returned a positive result led to Williams having probable cause.

Plaintiff states that "whether a reasonable officer would accept the test with the

many errors Williams made and rely on the result is a material question of fact for the jury." [*Id.*, p. 15]. However, Plaintiff fails to point to any evidence that suggests that Williams' failure to administer the test properly resulted in a heightened chance of a false positive or that a reasonable officer would have known the test was invalid as a result of his actions. Even if how Williams performed the test did increase the chances of a false positive, Williams would still be able to rely on the test result. As noted by the Northern District of Georgia, "no case at any level, in any court, has established (clearly or otherwise) that field drug tests cannot, because of possible false positives, support probable cause. Indeed, [Courts have] held quite the opposite—that the possibility of false positives does not render field tests insufficient to support probable cause." *Brown v. Sirchie Acquisition Co., LLC,* No. 1:16-CV-175-SCJ, 2017 WL 4082690, at *12 (N.D. Ga. 2017) aff'd, 694 F. App'x 745 (11th Cir. 2017) (citing *McCabe v. Gonzales*, No. 1:13-CV-435-CWD, 2015 WL 5679735, at *8 (D. Idaho Sept. 25, 2015)); *see also Michel v. United States*, No.: 16-CV-277-GPC(AGS), 2017 WL 4922831, at *9 (S.D. Cal. 2017) (collecting additional cases that have held that a presumptive field drug test, by itself, is sufficient probable cause to arrest even if the confirmatory test comes out negative).

In this case, Williams had used the drug test kits approximately a dozen times, and this instance was his first false positive. Accordingly, Williams had added reason to rely on the drug test in establishing probable cause.

Further, Williams showed the result to a member of the narcotics team, Phillips,

who agreed that the test returned a positive result. While Phillips may not have been present for the test—or had the facts needed to make a full determination as to whether the test showed a positive result—Williams still could rely on Phillips' expertise and assurances in developing a reasonable belief of probable cause.[6]

While Plaintiff insists that the test result was negative, officers are permitted to make mistakes. *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018). Accordingly, the Court need only examine whether the officers' mistakes were reasonable. Based on Williams' prior experience conducting drug tests and the confirmation from a member of the narcotics team, he concluded the test showed a positive result. The Court finds that Williams' belief was reasonable.

Lastly, as explained below, Plaintiff fails to show that Williams violated any clearly established law in performing his duties and, in particular, developing the probable cause needed to justify an arrest.

For these reasons, the Court finds that Williams, in his individual capacity, is entitled to qualified immunity as to Plaintiff's § 1983 false arrest claim. Likewise, since Williams possessed at least arguable probable cause to arrest Plaintiff, Plaintiff's claims

---

[6] Plaintiff states that the "instructions refer to an 'immediate Dark Blue or Dark Purple…within 2 seconds' for a positive result as opposed to a 'Pink within 5 seconds slowly shifting to Lavender within 20 seconds' for a negative result." [Doc. 37-2, p. 12]. Accordingly, Plaintiff rationalizes that Phillips could not render a judgment unless he was present for the test. However, Phillips evidently believed he was able to render a judgment. [Doc. 30-4, Phillips Aff., ¶¶ 4—6]. Even if Plaintiff is correct—and Phillips was bullish in his analysis—Williams was still entitled to rely on the expertise of a member of the County's narcotics team in forming a reasonable belief.

based upon her subsequent detention and prosecution also fail.

### ii.  Failure to Train

To the extent Plaintiff is attempting to make a failure to train claim against Williams, Plaintiff's claim fails because Williams was not responsible for training on the use of the Sirchie test kits. In fact, Williams was the one who performed the test. Under § 1983, a supervisor can be held liable for failing to train his or her employees "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). However, Williams cannot be liable for failing to train himself. Accordingly, Plaintiff's failure to train claim against Williams—to the extent it existed—fails as a matter of law.

### iii.  Deliberate Indifference to Serious Medical Needs

Plaintiff also claims that Williams was involved in her medical treatment and that Williams acted with deliberate indifference to her serious medical needs. However, the evidentiary record does not support these assertions.

The Eighth Amendment prohibits indifference to an inmate's serious medical needs so deliberate that it "constitutes the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "Technically, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees" like Fincher. *Goebert v. Lee Cty.*, 510 F.3d 1312,

1326 (11th Cir. 2007) (quoting *Snow ex rel. Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1268 (11th Cir. 2005)). "However, the standards under the Fourteenth Amendment are identical to those under the Eighth." *Goebert*, 510 F.3d at 1326 (citing *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005))

In *Estelle*, the Supreme Court recognized that the Constitution requires the government to provide medical care to inmates because the failure to do so "may actually produce physical 'torture or a lingering death'" or, "[i]n less serious cases, . . . may result in pain and suffering which no one suggests would serve any penological purpose." *McElligot v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999) (citing *Estelle*, 429 U.S. at 103). Still, "deliberate indifference is a stringent standard of fault, requiring proof that [the] actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997); *see also Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995).

"To prevail on a claim of deliberate indifference, a plaintiff must show: (1) a serious medical need; (2) defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury." *McDaniels v. Lee*, 405 F. App'x 456, 458 (11th Cir. 2010) (citing *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009)).

To establish Williams was deliberately indifferent to Plaintiff's need, Plaintiff must show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that

risk; (3) by conduct that is more than gross negligence." *Lee*, 405 F. App'x at 458 (citing

*Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010)).

"Subjective knowledge" requires that the official "both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exist[ed], and

he must also draw the inference." *Collins v. Bates,* No. 17-14559-G, 2018 WL 5090845, at

*5 (11th Cir. 2018) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "'[A]n official's

failure to alleviate a significant risk that he should have perceived but did not' is

insufficient to establish a constitutional violation." *Collins*, 2018 WL 5090845, at *5

(citing *Farmer*, 511 U.S. at 837).

Here, Plaintiff has produced no evidence—that is not conclusory—that Williams

was subjectively aware of a substantial risk of harm to Plaintiff. Plaintiff states that

Williams was involved in her medical care because (1) she recalls speaking with

Williams in the jail, (2) a Kevin Williams is listed as recording and prescribing Fincher's

ibuprofen prescriptions, and (3) a Kevin Williams is listed as setting an appointment for

Fincher.

As noted above, the Kevin Williams listed in her medical records is likely a

dentist with the same name as the Defendant. On January 23, 2017, the appointment set

by this Williams was for a dental-related sick call. [Doc. 37-10, pp. 59—60]. On January

23, 2017, the ibuprofen prescription this Williams recorded was prescribed by a Jackson

Lester DDS, a dentist. [*Id.* at 29]. And the ibuprofen prescribed on February 5, 2017, lists

"Kevin Williams DDS" as the prescriber. [*Id.* at 31]. The Court is only required to accept justifiable inferences as true in Plaintiff's favor. Plaintiff's contention that the Kevin Williams that arrested her was also involved in her dental treatment is without adequate justification.

However, even assuming Defendant Williams recorded Plaintiff's prescriptions and appointments, merely logging Plaintiff's dental records does not show that he was subjectively aware of Plaintiff's allegedly insufficient medical care. Plaintiff alleges insufficient medical care arising from two medical issues, an ovarian cyst and fractured hand. On February 11, 2017, when Fincher punched a wall, she was taken to the hospital the same day and diagnosed with a broken metacarpal. Fincher was instructed to follow up with her doctor in three days when the swelling went down to put a cast on it. Although no follow-up appointment was made as instructed by the treating physician, Fincher was given ice and pain medication as needed. Similarly, on January 15, 2017, Fincher was taken to the hospital the same day she complained of abdominal pain and diagnosed with an ovarian cyst. While she again did not have a follow-up appointment at the hospital, the jail doctor provided pain medication as needed.

Plaintiff presents no evidence that Williams was aware of insufficient treatment to Plaintiff's ovarian cyst or broken hand. Plaintiff does not allege she told Williams about her medical issues or that she recalls him being involved in her treatment. [Doc. 32, Fincher Depo., p. 49:1—10]. Further, the medical records containing a Kevin

Williams are unrelated to the ovarian cyst or broken hand.

Thus, Plaintiff has failed to present evidence sufficient to show that Williams was subjectively aware of her serious medical needs and that he acted with deliberate indifference to those needs. Accordingly, even if medical staff did act deliberately indifferent to Fincher's medical needs by denying instructed follow-up care for a broken metacarpal or otherwise insufficient medical treatment, Plaintiff has not shown Williams could be liable for those actions.

### 3. Claims Against Henderson in His Individual Capacity

#### i. Failure to Train

As noted above, a failure to train claim fails if the defendant was not a supervisory official and had no duty to train. Plaintiff presents no evidence that Henderson had a duty to train or was a supervisory official. Accordingly, to the extent Plaintiff attempts to make a failure to train claim against him, her claim fails as a matter of law.

#### ii. Extension of Prison Time Claim for Henderson

Plaintiff also attempts to make out a § 1983 claim for false imprisonment against Henderson. A § 1983 claim of false imprisonment requires a showing of common law false imprisonment and a due process violation under the Fourteenth Amendment. *Campbell v. Johnson,* 586 F.3d 835, 840 (11th Cir. 2009) (citing *Cannon v. Macon Cty.,* 1 F.3d 1558, 1562–63 (11th Cir. 1993), modified on other grounds, 15 F.3d 1022 (1994)).

"The elements of common law false imprisonment are an intent to confine, an act resulting in confinement, and the victim's awareness of the confinement." *White v. Dekalb Cty.*, 665 F.App'x 795, 797 (11th Cir. 2016) (quoting *Campbell*, 586 F.2d at 840). "Fourteenth Amendment Due Process Clause includes the right to be free from continued detention after it was or should have been known that the detainee was entitled to release." *Campbell*, 586 F.2d at 840 (quoting *Cannon*, 1 F.3d at 1563). "To establish a due process violation, [Plaintiff] must prove that [Henderson] acted with deliberate indifference." *Campbell*, 586 F.2d at 840 (citing *West v. Tillman*, 496 F.3d 1321, 1327 (11th Cir.2007)). "This means that [Henderson] had subjective knowledge of a risk of serious harm and disregarded that risk by actions beyond mere negligence." *Campbell*, 586 F.2d at 840 (citing *West v. Tillman*, 496 F.3d 1321, 1327 (11th Cir. 2007)).

Plaintiff does not point to evidence that suggests Henderson intended to keep her confined. Plaintiff does not even show Henderson was aware that she was in jail. [Doc. 39, Henderson Depo., p. 27: 20—24]; [Doc. 37-2, pp. 8, 17]. Therefore, Henderson lacked the mindset needed to be culpable for false imprisonment. Moreover, Plaintiff fails to show that Henderson's actions resulted in her continued confinement. Simply because Henderson accessed GBI's test results Friday, March 31, 2017, and Monday, April 3, 2017, does not mean he delayed her release until Tuesday, April 4, 2017. Lastly, as explained below, Plaintiff fails to point to any law showing that Henderson violated clearly established law in the performance of his duties. Accordingly, Plaintiff's false

imprisonment claim against Henderson is due to be dismissed.

**4.** <u>**Individual Defendants Did Not Violate Clearly Established Law**</u>

Even assuming Plaintiff could establish that any official had violated her

constitutional rights under these circumstances, she fails to point to case law that

demonstrates those rights were clearly established at the time of the violation. Critically,

Plaintiff never identified any case that referenced a factual situation similar to the one

Williams and Maples faced. *See generally* [Doc. 37-2]. Additionally, the Court cannot say

that the officers' conduct so obviously violated the Constitution given the facts stated

above and the officers' duty to preserve public order and investigate crimes. O.C.G.A §

35-8-2(8)(A).

**5.** <u>**Claims against Henderson and Williams in their Official Capacity**</u>

As Plaintiff was unclear whether Defendants are sued in their individual or

official capacities, the Court will now examine Defendants Williams and Henderson's

liability in their official capacity. Defendants Henderson and Williams are entitled to

Eleventh Amendment immunity from Plaintiff's § 1983 official-capacity claims arising

from the arrest and pretrial detainment. For purposes of Eleventh Amendment

immunity, Fincher's official capacity claims against Henderson and Williams are treated

the same as official capacity claims against the sheriff. *See Scruggs v. Lee*, 256 F. App'x

229, 232 (11th Cir. 2007) (per curiam) (holding that employees of the sheriff were

entitled to Eleventh Amendment immunity in their official capacities); *see also Lake,* 840

F.3d at 1342 (11th Cir. 2016) ("A deputy's functions are derived from the sheriff's functions, so the deputy's performance of this function is also a state function").

Official-capacity claims against the sheriff are suits "against the entity" for which the sheriff acted as an agent. *McMillian* 520 U.S. at 785 n.2. As explained below, the Court concludes that the officers acted as an "arm of the state" while performing all of the functions giving rise to Fincher's claims.

The Eleventh Amendment bars suits in federal court against the state or an "arm of the state." *Manders*, 338 F.3d at 1308. Whether a Georgia sheriff is an arm of the state "must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." *Id*. Four factors are used to determine whether an entity is an arm of the state: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Id*. at 1309. Officers acting on behalf of a municipality or as an "arm of the county" may not invoke the state's immunity. *Freyre v. Chronister*, 910 F.3d 1371, 1380 (11th Cir. 2018) (quoting *Stanley v. Israel*, 843 F.3d 920, 924 (11th Cir. 2016)).

In Georgia, a county sheriff and employees are acting as an "arm of the state" when performing law enforcement functions. *See Grech*, 335 F.3d at 1353 (finding a sheriff acts on behalf of the state "in his function as a law enforcement officer and keeper of the peace in general"); *see also Townsend*, 854 F.Supp.2d at 1347 (finding a

deputy sheriff acted as an arm of the state while making an investigatory stop and arrest); *Mladek v. Day*, 293 F.Supp.2d 1297, 1304 (M.D. Ga. 2003) (concluding that county sheriff wore "state hat" at time of plaintiff's arrest and subsequent detention).

Further, a Georgia county sheriff operating a county jail acts as an arm of the state in performing functions such as providing medical care. *Brooks v. Wilkinson Cty.*, 393 F. Supp. 3d 1147, 1160 (M.D. Ga. 2019); *Palmer v. Correct Care Sols., LLC,* 291 F. Supp. 3d 1357, 1362 (M.D. Ga. 2017).

Because Monroe County sheriff's office acted as an arm of the state in arresting Fincher, detaining her, and providing her medical care, Defendants are entitled to immunity from Plaintiff's § 1983 official-capacity claims for monetary damages.

### D.    State Law Claims Against Williams and Henderson

#### 1.    <u>Official Capacity</u>

Under Georgia law, "[t]he doctrine of sovereign immunity, also known as governmental immunity, protects all levels of governments from legal action unless they have waived their immunity from suit." *Cameron v. Lang*, 274 Ga. 122, 549 S.E.2d 341, 346 (2001); Ga. Const. Art. I, § 2, ¶ IX(d). Counties are among the protected governmental entities, *see Gilbert*, 452 S.E.2d at 479, and sheriffs acting in their official capacities are "entitled to the benefit of [their] County's sovereign immunity defense." *Id*. at 484. "[S]overeign immunity is waived by any legislative act which specifically provides that sovereign immunity is waived and the extent of such waiver." *Id*. at 480.

As noted above, Plaintiff points to no authority showing Monroe County waived its

sovereign immunity. Accordingly, Plaintiff's claims against the individual Defendants,

in their official capacity, are protected by sovereign immunity.

### 2.    Individual Capacity

Plaintiff asserts state law claims for gross negligence, intentional infliction of

emotional distress, negligent medical care, negligent inmate care, false arrest, false

imprisonment, malicious arrest, malicious imprisonment, malicious prosecution,

negligent employment, negligent training against the officer Defendants in their

individual capacities. [Doc. 4, ¶ 2]. Plaintiff also alleges Defendants were negligent in

the ministerial administration of the roadside test and testimony to the Grand Jury and

Court, which was the proximate cause of Dasha Fincher's arrest, incarceration, and

resulting injuries. [*Id.*, ¶ 105].[7] Georgia's official immunity applies to Plaintiff's

intentional infliction of emotional distress claim as well as her other state law claims.

*Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1333 n.4 (11th Cir. 2006). As Defendants are sued

in their individual capacity, Williams and Henderson argue that they are entitled to

official immunity regarding the Plaintiff's state law tort claims.

### i.    Ministerial and Discretionary Duties

Public officials are "subject to suit only when they negligently perform or fail to

---

[7] Only Defendant Maples testified at the Grand Jury. As Maples' case is stayed pursuant to his bankruptcy action, the Court will not consider whether Maples violated a ministerial duty when testifying to the Grand Jury.

perform their ministerial function or when they act with actual malice or intent to cause injury in the performance of their official functions." *Gilbert*, 452 S.E.2d at 483. Whether a duty is ministerial or discretionary turns on the character of the specific act. *Reed v. Dekalb Cty.*, 589 S.E.2d 584, 587 (Ga. Ct. App. 2003) "A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." *Common Cause/Georgia v. City of Atlanta,* 279 Ga. 480, 482(2), 614 S.E.2d 761 (2005). A discretionary act, on the other hand, "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Id*.

To pierce the officers' official immunity for all state law claims arising from discretionary acts, Fincher must demonstrate they acted with actual malice. *Bashir*, 445 F.3d at 1333; *Adams v. Hazelwood*, 271 Ga. 414, 414-15, 520 S.E.2d 896, 898 (1999). The Supreme Court of Georgia has explained that "actual malice' requires a deliberate intention to do wrong and denotes 'express malice or malice in fact.'" *Id*. (quoting *Merrow v. Hawkins*, 266 Ga. 390, 467 S.E.2d 336, 338 (1996)) (citation omitted).

Plaintiff has not demonstrated that Defendants acted with actual malice. Accordingly, Defendants are entitled to official immunity regarding Plaintiff's state law claims if Defendants were performing discretionary actions. Therefore, Defendants may only be liable if they were performing ministerial—rather than discretionary—duties.

### ii.    Duty to Administer Drug Test Kit

As an initial matter, most of Defendants' actions related to the arrest were discretionary in nature. Deciding whether to test a substance and determining to send those substances to a lab for further testing are not "simple, absolute, and definite" tasks that require simple "execution of a specific duty." *Sirchie Acquisition Co., LLC*, 2017 WL 4082690, at *8. (citing *Hemak v. Houston Cty. Sch. Dist.*, 469 S.E.2d 679, 681 (Ga. Ct. App. 1996)). These decisions are discretionary in nature, requiring the officers to use their personal deliberation and judgment. Accordingly, as Plaintiff has not shown Defendants acted with actual malice, her state law claims related to these functions are extinguished.

The Court next turns to whether Williams was performing a ministerial function when administering the drug test. Williams did not follow the instructions provided on the Sirchie Test Kit because, at a minimum, he did not wear gloves and used an improper dose of testing materials. [Doc. 37-2, p. 14]. Plaintiff, therefore, alleges that Williams contaminated the test. [*Id.*, pp. 13—14]. While Williams did not follow the step-by-step instructions provided by Sirchie, Plaintiff points to no sheriff's office policy requiring him to follow Sirchie's protocols. [*Id.*]. Further, Plaintiff has not pointed to any evidence that Williams' failure to follow Sirchie's testing instructions caused the false positive. Absent evidence that Williams' actions caused the false positive, whether Williams had a ministerial duty to follow Sirchie's testing instructions is not material.

Alternatively, Plaintiff also argues that the test did not show a false positive and that Williams misread the result. Relying on a photo of the test result, Plaintiff states that the result could have shown a negative result. However, interpreting the drug test is not a ministerial act with a definitive outcome—while the resulting mixture is based on relatively straightforward chemistry, the test still requires human beings to use their judgment in interpreting the result. The analysis involved in determining the outcome is underscored by Williams having sought a second opinion and the continued dispute as to whether the result was positive or negative for meth. Accordingly, the Court finds that Williams cannot be liable for any negligence in interpreting the resulting mixture.

### 3.    Failure to Respond to State Claims

Moreover, Plaintiff failed to address any state law claims in her reply brief. "When a non-moving party fails to address particular claims in the moving party's motion for summary judgment but responds to other arguments, the non-moving party abandons these claims." *See Johns v. CSX Transportation, Inc.,* 210 F.Supp.3d 1357, 1373 (M.D. Ga. 2016); *Jolley v. Triad Mechanical Contractors*, No. 5:13–CV–247-MTT, 2015 WL 1299852, at *8, n. 16 (M.D. Ga. 2015); *Sentinel Ins. Co., Ltd. v. Action Stop, LLC,* 958 F.Supp.2d 1368, 1381 (M.D. Ga. 2013); *Hammond v. Gordon Cty.*, 316 F.Supp.2d 1262, 1280 (N.D. Ga. 2002). Accordingly, to the extent Plaintiff's state law claims against individual Defendants were not already due for dismissal for the reasons stated above, the Court finds Plaintiff has abandoned her state law claims.

<u>CONCLUSION</u>

Without a doubt, Plaintiff should never have spent 94 days in jail. And while the Court certainly empathizes with her, it nonetheless must follow the requisite law. Simply put, Plaintiff failed to put forth the required evidence needed to hold the Defendants monetarily liable for her suffering. Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 30]. Accordingly, the Court dismisses Defendants Williams, Henderson, and Monroe County. Maples remains in the suit pursuant to the bankruptcy stay. In accordance with Federal Rule of Civil Procedure 54(b), the Court **FINDS** that this judgment disposes of Plaintiff's separable claims against Defendants Monroe County, Henderson, and Williams, and there is no just reason for a delay of entry of final judgment in favor of the dismissed Defendants. The Clerk is **DIRECTED** to enter this Final Judgment in favor of Defendants Monroe County, Henderson, and Williams. Further, the Clerk is directed to administratively close the case. Within 30 days of the conclusion of Defendant Maples' bankruptcy case, Plaintiff may reopen the case so that the Court can consider Defendant Maples' motion.

**SO ORDERED**, this 30th day of March, 2020.

<u>S/ Tilman E. Self, III</u>
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**